## MONTCLAIR *v.* RAMSDELL.

1. The township of Montclair in the county of Essex, New Jersey, had authority to issue bonds to be exchanged for bonds of the Montclair Railway Company.
2. The Constitution of New Jersey provides: " To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." *Held,* 1. That this provision does not require the title of an act to set forth a detailed statement, or an index or abstract, of its contents; nor does it prevent uniting in the same act numerous provisions having one general object fairly indicated by its title. 2. That the powers, however varied and extended, which a township may exercise constitute but one object, which is fairly expressed in a title showing nothing more than the legislative purpose to establish such township.
3. The conflict between the Constitution and a statute must be palpable, to justify the judiciary in disregarding the latter upon the sole ground that it

embraces more than one object, or that, if there be but one, it is not sufficiently expressed in the title. .

4. The holder of the bonds is presumed to have acquired them in good faith and for value. But if, in a suit upon them, the defence be such as to require him to show that value was paid, it is not, in every case, essential to prove that *he* paid it; for his title will be sustained if any previous holder gave value.

Error to the Circuit Court of the United States for the District of New Jersey.

The judgment below was in accordance with the verdict in an action brought by the defendant in error on certain bonds, payable to Samuel Holmes or bearer, and on coupons thereof payable to the holder, all dated March 17, 1870, and alleged to have been issued by the township of Montclair, Essex County, New Jersey. They are negotiable in form, and purport to have been executed in pursuance of an act approved April 9, 1868, entitled "An Act to authorize certain townships, towns, and cities to issue bonds, and to take the bonds of the Montclair Railway Company," — a corporation created with authority to construct a railway from the village of Montclair to the Hudson River at Pavonia or Hoboken ferries, or between those points. On the margin of each bond is the certificate of the county clerk of Essex County that it is registered in his office.

The first section of the foregoing act — which was declared to be a public act to take effect immediately upon its passage — provides: —

"Sect. 1. That on the application in writing of twelve or more freeholders, residents of any township, town, or city along the route of the Montclair Railway Company, or at the terminus thereof (*except the township of Bloomfield,* in the county of Essex, *which township is hereby excepted from the operation of all the provisions of this act*), it shall be the duty of the judge of the Circuit Court of the county wherein such freeholders shall reside, within ten days after receiving such application, to appoint under his hand and seal not more than three freeholders, residents of such township, town, or city, to be commissioners thereof, to carry into effect the purposes and provisions of this act; said commissioners shall hold their offices respectively for the term of five years, and until others shall have been appointed."

The second and third sections are as follows : —

"SECT. 2. That it shall be lawful for said commissioners to borrow, on the faith and credit of their respective townships, towns, or cities, such sums of money, not exceeding twenty per centum of the valuation of the real estate and landed property of such township, town, or city, to be ascertained by the assessment rolls thereof, respectively, for the year 1867, for a term not exceeding twenty-five years, at the rate of interest not exceeding seven per centum per annum, payable semi-annually, and to execute bonds therefor, under their hands and seals respectively. The bonds so to be executed may be in such sums, and payable at such times and places, as the said commissioners, and their successors, may deem expedient; but no such debt shall be contracted, or bonds issued by said commissioners of, or for either of said townships, towns, or cities, until the written consent of the persons owning or representing as agent or president at least two-thirds of the real estate and landed property of such township, town, or city, borne on the last assessment roll thereof, at the valuation thereon appearing, shall have been obtained.

"Such consent shall state the amount of money authorized to be raised in such township, town, or city, and that the same is to be invested in the bonds of said railway company, and the signatures shall be proved by one or more of said commissioners. The fact that the persons signing such consent own or represent, as aforesaid, at least two-thirds of the taxable real and landed property of such township, town, or city shall be proved by the affidavit of the assessor of such township, town, or city, indorsed upon or annexed to such written consent, and the assessor of such township, town, or city is hereby required to perform such service. Such consent and affidavit shall be filed in the office of the clerk of the county in which such township, town, or city is situated, and a certified copy thereof in the office of the clerk of such township, town, or city, and the same, or a certified copy thereof, shall be evidence of the facts therein contained, and shall be received as evidence in any court of this State and before any judge or justice thereof.

"SECT. 3. And be it enacted, That the said commissioners authorized by this act may, in their discretion, dispose of such bonds, or any part thereof, to such persons or corporations, and upon such terms as they shall deem most advantageous for their said townships, towns, or cities, but not for less than par, and the money that shall be raised by any loan or sale of bonds shall be invested in the

bonds of the said railway company for the purpose of building the railway thereof, and said money shall be applied and used in the construction of said railway, its buildings, equipments, and necessary appurtenances, and for no other purpose. The commissioners respectively, in the corporate name of each of their said townships, towns, or cities, shall subscribe for and purchase bonds of said railway company to the amount that they severally may have borrowed as aforesaid."

After providing that the commissioners shall execute their official bonds, with security to be approved by the judge (all of which was done in this case), and that they shall be a board to act for their respective townships, towns, and cities, with power, by a majority, to do any business authorized by the act, the twelfth and fourteenth sections declare: —

"Sect. 12. That all bonds issued in accordance with the provisions of this act shall be registered in the office of the county in which the township, town, or city so issuing is situated, and the words 'registered in the county clerk's office' shall be printed or written across the face of each bond, attested by the signature of the county clerk when so registered, and no bonds shall be valid unless so registered."

"Sect. 14. That in case any new township, town, or city *shall have been created*, or the boundaries of any township, town, or city shall have been enlarged on the routes of the said railway, or at the termini thereof, so that there is no assessment roll for the year 1867 for such township, town, or city so created or enlarged, the said commissioners for such *new* or enlarged township, town, or city shall cause to be prepared an assessment roll for the purposes of this act, by extracting from any assessment roll or rolls for said year all that relates to any assessment of persons or property in the territory embraced in the said *new township*, town, or city so enlarged or created, or in said enlargement."

On the fifteenth day of April, 1868, the legislature of New Jersey passed another act, the provisions of which are important. It is entitled "An Act *to set off from the township of Bloomfield*, in the county of Essex, *a new township*, to be called the Township of Montclair." The first section defines the boundary of the new township, and the second constitutes its inhabitants a body politic and corporate in law by the name of

" *The inhabitants of the township of Montclair,*" with all the rights, powers, privileges, and advantages, and subject to all the regulations, government, and liabilities to which the inhabitants of the other townships in said county of Essex are or may be entitled or subject by the laws of the State.

The third section, after prescribing the time and place at which the first town meeting of Montclair should be held, and that the voting thereat should be by ballot until otherwise determined by law, declares : —

" That all the provisions and restrictions of an act entitled ' An Act to authorize the inhabitants of the several townships of this State to vote by ballot at their town meetings,' approved March twenty-second, eighteen hundred and sixty, and of the supplements thereto, shall apply to the inhabitants of the said township of Montclair, and all acts and parts of acts in force in the said township of Bloomfield at the time of the passage of this act are hereby extended to and shall be in force in the said township of Montclair, but the provisions of any act or acts from the operation of which the township of Bloomfield has, by any proviso or exception contained therein, been specially excepted, shall apply to and be in force in said township of Montclair from and after the time this act shall go into effect, the same as if the township of Bloomfield had not been specially excepted therein."

*Mr. William M. Evarts* and *Mr. Thomas N. McCarter* for the plaintiff in error.

*Mr. John F. Dillon* and *Mr. Rastus S. Ransom* for the defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court, and, after stating the foregoing facts, proceeded as follows : —

In behalf of the township of Montclair it is contended that the bonds and coupons in suit were executed and issued without legislative authority, and, consequently, are not enforceable. This proposition, being fundamental in the case, will be first considered.

It has been observed that the first section of the act of April 9, 1868, — the one referred to in the bonds, — expressly excepts from its operation the township of Bloomfield. The Circuit Court was of opinion, and so ruled, that Montclair, upon

being set off from Bloomfield Township, and made a separate municipal corporation, with all the rights, powers, and privileges of other townships in the same county, was no longer embraced in the exception of Bloomfield Township made by the act of April 9, 1868, but, as a distinct independent body politic and corporate, became entitled, in virtue of the fourteenth section of that act (and without reference to the proviso in the third section of the act of April 15, 1868), to take advantage of all the provisions of the original or bonding act. Some of the members of this court prefer not to rest the determination of the question of legislative authority upon that interpretation of the original act. But we are of opinion that the proviso of the third section of the act creating the township of Montclair — declaring in force, as to that township, " the provisions of any act or acts from the operation of which the township of Bloomfield has by any proviso or exception contained therein been specially excepted " — must be construed as taking Montclair out of the exception in the first section of the act of April 9, 1868, and adding it to the class of townships which, by that act, were authorized to raise money upon bonds, to be invested in bonds of the railway company. Thenceforward, the township of Bloomfield, within the meaning of the act of April 9, 1868, embraced only such territory and inhabitants as remained after Montclair Township was set off as an independent municipality. The recital in the bonds that they were issued in pursuance of that act must therefore be taken as referring to it, as enlarged or extended by the act of April 15, 1868.

It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed. We should assume that the legislature was aware, when the act of April 15, 1868, was passed, that a previous statute had expressly excepted Bloomfield Township from all of its provisions. When, therefore, they declared that the new township should come under the operation of *any* act from which Bloomfield had been specially excepted by any proviso thereof, the established canons of statutory construction require us to presume that the legislature understood the full legal effect of such a declaration. The pur-

pose, manifestly, was to relieve the new township from the disabilities imposed by the bonding act upon the township of Bloomfield as then established.

This would close the discussion of the question of legislative authority, but for another proposition which counsel have pressed with great earnestness. They insist that this construction of the act of April 15, 1868, brings it, or so much thereof as constitutes its third section, in conflict with sect. 7 of art. 4 of the New Jersey Constitution, which declares that "to avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." The argument is not simply that the authority given by the act of April 9, 1868, to issue township bonds in aid of the Montclair Railway Company (which authority we have seen is imported into the act of April 15, 1868), is an object distinct and separate from others embraced by the Montclair Township act, but that such object is not expressed in the title of the latter act.

The purpose of this constitutional provision was declared by the Supreme Court of New Jersey in *State* v. *Town of Union*, 33 N. J. L. 350, to be "to prevent surprise upon legislators by the passage of bills, the object of which is not indicated by their titles, and also to prevent the combination of two or more distinct and unconnected matters in the same bill." Further, said the court: "It is not intended to prohibit the uniting in one bill of any number of provisions having one general object fairly indicated by its title. The unity of the object must be sought in the end which the legislative act proposes to accomplish. The degree of particularity which must be used in the title of an act rests in legislative discretion, and is not defined by the Constitution. There are many cases where the object might with great propriety be more specifically stated, yet the generality of the title will not be fatal to the act, if by fair intendment it can be connected with it." The case in which these remarks occurred involved the constitutionality of an act entitled "An Act to amend an act to incorporate the town of Union, in the township of Union, in the county of Hudson, approved March 29, 1864." The body of the act declared

valid a certain ordinance passed by the town of Union without the formalities required by its charter, but under which a sewer had been constructed. In response to the objection that the object of the act — the construction of sewers — was not expressed in its title, the court said: "The validity of acts with general titles has been so long recognized by our courts, that it cannot be questioned that under the title, 'An Act to *incorporate* the town of Union,' a government for the town could be established, including taxation for its support, courts for the trial of offenders, authority for laying out streets, build-. ing sewers, and making assessments. Under any other rule it would be impossible to organize a city government without a large number of distinct acts. If, under that general title, the formalities for building a sewer and making assessments may be prescribed, there is no reason why a dispensation from the use of the required forms may not be granted by an act entitled ' An Act to *amend* an act to incorporate the town of Union.'" "If this objection," continued the court, "was sustained, it would annul a large portion of the legislation of this State." The doctrines of that case were approved in *State* v. *City of Newark*, 34 N. J. L. 236. In the earlier case of *Gifford* v. *New Jersey Railroad Co.*, 2 Stock. (N. J.) 172, an act supplemental to a former act was sustained upon the ground that the objects of both acts " were parts of the same enterprise, and cannot be said to have any improper relation to each other."

Our attention is called by counsel for the defendant to *Rader* v. *Township of Union*, 39 N. J. L. 509, and *Pennsylvania Railroad Co.* v. *National Railway Co.*, 23 N. J. Eq. 441, 457. But these do not in the slightest degree impinge upon the doctrines of the other cases. Referring, in the Rader case, to the constitutional provision under examination, Chief Justice Beasley observed that its purpose is plainly twofold: " First, to secure a separate consideration for every subject presented for legislative action; second, to insure a conspicuous declaration of such purpose. By the former of these requirements, every subject is made to stand on its own merits, unaffected by ' improper influences,' which might result from connecting it with other measures having no proper relation to it; and, by the latter, a notice is provided, so that the public,

or such part of it as may be interested, may receive a reasonable intimation of the matters under legislative consideration." In the same case he said that the Constitution required "substantial unity in the statutable object." We do not understand these remarks as announcing any different rule from that established in the cases in 33 and 34 N. J. L. What was said in 23 N. J. Eq. is clearly in line with other cases. And the doctrines of the New Jersey court are in harmony with decisions of the highest courts of other States when construing similar provisions in the constitutions of their respective States. See authorities cited in Cooley's Const. Lim. 146, n. 1.

Upon the authority of these decisions, and upon the soundest principles of constitutional construction, we are of opinion that the objection taken to the act of April 15, 1868, as being (when construed as we have indicated) in conflict with the Constitution of New Jersey, cannot be sustained. The powers which the township of Montclair is authorized to exert, however varied or extended, constitute, within the meaning of the Constitution, one object, which is fairly expressed in a title showing the legislative purpose to establish a new or independent township. It is not intended, by the Constitution of New Jersey, that the title to an act should embody a detailed statement, nor be an index or abstract of its contents. The one general object — the creation of an independent municipality — being expressed in the title, the act in question properly embraced all the means or instrumentalities to be employed in accomplishing that object. As the State Constitution has not indicated the decree of particularity necessary to express in its title the one object of an act, the courts should not embarrass legislation by technical interpretations based upon mere form or phraseology. The objections should be grave, and the conflict between the statute and the Constitution palpable, before the judiciary should disregard a legislative enactment upon the sole ground that it embraced more than one object, or if but one object, that it was not sufficiently expressed by the title.

The assignments of error, unusually large in number, raise other questions. Such of them as we deem necessary to examine relate to the rejection as well of evidence offered as of instructions asked in behalf of the township.

The main provisions of the bonding act will be found in the statement which precedes this opinion. As preliminary to an issue of township, town, or city bonds, by such commissioners as might be appointed on the petition of freeholders, the statute requires the written consent of persons owning, or representing as agent or president, at least two-thirds of the real estate of the municipality, — the bonds so issued not, however, to exceed twenty per cent of the value of its landed property, and the consent so obtained stating the amount to be raised and that it is to be invested in the bonds of the railway company. The statute further provided, as we have seen, that the signatures of consenting freeholders should be proved by one or more of the commissioners; that the fact that the consenting freeholders owned or represented the requisite amount of landed property should be proved by the assessor, who was required to perform such service; and that the consent and affidavit should be filed in the office of the clerk of the county in which the municipality is situated, and a certified copy thereof in the office of the clerk of the township, town, or city, — the originals, or a certified copy thereof, to be received as evidence of the facts therein contained in any court of the State or before any judge or justice thereof.

The declaration in each count, whether on bond or coupon, expressly avers that in pursuance of the statute such consents were obtained; also, that the commissioner duly appointed and sworn, as directed by the statute, issued the bonds in suit; that thereafter, and before they respectively matured, a certain named bank became, for a valuable consideration, in public market paid, the holder and bearer thereof, and that thereafter, and before the commencement of suit, the plaintiff became, for a valuable consideration by him paid to said bank, and still is, the holder and bearer thereof.

The only plea in behalf of the township to the special counts on the bonds and coupons is *non est factum;* to the common count for interest, *nil debet.*

At the trial the plaintiff introduced evidence tending to show that the commissioners were duly appointed in the mode prescribed by statute. If their due appointment was put in issue by the general plea of *non est factum*, it is suffi-

cient to say that the question was properly submitted to the jury.

The plaintiff also produced at the trial, from the county clerk's office, the original consents with the affidavits connected therewith, and also certified copies from the office of the township clerk. They show that the freeholders consented to an issue of bonds, to an amount not exceeding $200,000, under the act of April 9, 1868, to " be exchanged for or their proceeds invested in the income bonds ". of the railway company. Upon each is indorsed the affidavit of Van Giesen, assessor, showing that the consenting freeholders owned or represented at least two-thirds of the landed property of the township. These papers in form met all the requirements of the statute.

Numerous offers to introduce evidence in behalf of the township were denied. They were made in every form which the ingenuity of able counsel could suggest. Without incumbering this opinion with a detailed statement of them, it is enough to say that the township was denied the privilege of proving that the consents did not, in fact, represent the required amount of landed property; that Van Giesen, the assessor, made his affidavit without having extracted from any assessment roll the taxable value of the real estate to enable him to determine whether the consents represented sufficient real estate ; and that the commissioners acted on that affidavit before Van Giesen had taken the oath of office. Upon the occasion of these offers, or of some of them, counsel for defendants, in response to inquiries by the court, disclaimed any ability to bring home to plaintiff knowledge of these departures from the requirements of the statute. Upon the same view of the law, as we suppose, counsel asked the court to give — but the court refused — the following instructions to the jury : " If the evidence satisfies the jury that there were circumstances of fraud or illegality in the inception of the bonds, or in the circumstances under which they were issued and disposed of by the commissioners, then the plaintiff cannot recover on the bonds without some proof that he purchased them for value, or gave some consideration for them."

" That, by the issue presented by the pleadings in the case, the burden of showing that he was a purchaser for 'value, or claims title through such a purchaser, was on the plaintiff."

As to the last of these instructions, there is no ground whatever upon which it could stand.  The pleadings did not, of themselves, impose upon plaintiff the necessity of showing either that he, or any prior holder of the bonds, was a purchaser for value.  As holder he is presumed to have acquired them in good faith and for value.  *Goodman* v. *Simonds*, 20 How. 343 ; *Murray* v. *Lardner*, 2 Wall. 110 ; *Shaw* v. *Railroad Company*, 101 U. S. 557 ; *Swift* v. *Smith*, 102 id. 442. The plea of *non est factum* did not put in issue the fact that he was the holder.  Legislative authority for an issue of bonds being established by reference to the statute, and the bonds reciting that they were issued in pursuance of the statute, the utmost which plaintiff was bound to show to entitle him, *prima facie*, to judgment, was the due appointment of the commissioners and the execution by them, in fact, of the bonds.  It was not necessary that he should, in the first instance, prove either that he paid value, or that the conditions preliminary to the exercise by the commissioners of the authority conferred by statute were, in fact, performed before the bonds were issued.  The one was presumed from the possession of the bonds ; and the other was established by the statute authorizing an issue of bonds, and by proof of the due appointment of the commissioners, and their execution of the bonds, with recitals of compliance with the statute.  So we have often ruled in numerous cases with which the profession are familiar and which need not be cited.

But the contention of counsel is that it was competent, under the plea of *non est factum*, to prove either fraud or illegality in the inception of the bonds, in order to remove the presumption of *bona fide* ownership for value which arises from the mere possession of the bonds, and thus compel plaintiff to show that he paid value for them.  Consequently, it is argued, the first of the foregoing instructions should have been given.

It is not necessary to extend this opinion by a review of the adjudications in the American and English courts to which our attention has been called, or to deduce therefrom a general rule

to govern every case in which it may be claimed that the proof upon the part of a defendant, in a suit upon a negotiable security, requires the holder, before he can recover, to show that he paid value. Without entering upon a 'critical examination of the authorities upon this important question of commercial law, and assuming, for the purposes of this case merely, that the proof, of the exclusion of which the township complains, was competent evidence for some purposes under the plea of *non est factum*, we are of opinion that the instruction in question ought to have been refused. Its rejection was proper for the reason, if there were no other, that it required the jury, if they believed either fraud or illegality in the inception of the bonds to have been established, to find for the township, unless the plaintiff proved that *he* purchased for value or gave some consideration for them. Such is not the law; for, if any previous holder of the bonds in suit was a *bona fide* holder for value, the plaintiff, without showing that he had himself paid value, could avail himself of the position of such previous holder. In Byles on Bills, 119, 124, it is correctly said that "if any intermediate holder between the defendant and the plaintiff gave value for the bill, that intervening consideration will sustain the plaintiff's title." In *Hunter* v. *Wilson*, 19 L. J. N. s. Ex. 8, the plea was that the bill of exchange was drawn by a named person, at the request and for the accommodation of the defendant, without any consideration or value whatever, and that it was indorsed by that person without any consideration or value given by the plaintiff for such indorsement either to the defendant or to said person, or to any other person whatsoever. It was held that the plea ought to have contained a statement equivalent to an allegation that none of the previous parties to the bill had given value for the indorsement. One of the judges remarked that "some party to the bill may have given value for it, so as to vest a valid title in the plaintiff. We cannot tell through how many hands it may have passed." It is not necessary in this case to hold that the plea in such a case should aver that no previous holder of a negotiable security paid value. But the case last cited is authority for the proposition that the present plaintiff may be protected by showing that some previous holder paid value.

This question was directly adjudged in *Commissioners* v. *Bolles*, 94 U. S. 104. One of the issues there was whether the plaintiff was a *bona fide* holder of certain municipal bonds. After stating that the legal presumption was that they were, the court, speaking by Mr. Justice Strong, said: "But the plaintiffs are not forced to rest upon mere presumption to support their claim to be considered as having the rights of purchasers without notice of any defence. They can call to their aid the fact that their predecessors in ownership were such purchasers. To the rights of those predecessors they have succeeded. Certainly the railroad company paid for the bonds and coupons by paying an equal amount of their stock, which the county now holds; and nothing in the special facts found shows that the company knew of any irregularity or fraud in their issue." The court proceeded: "And still more: the contractor for building the railroad received the bonds from the county in payment for his work, either in whole or in part, after his work had been completed. There is no pretence that he had notice of anything that should have made him doubt their validity. Why was he not a *bona fide* purchaser for value? The law is undoubted, that every person succeeding him in the ownership of the bonds is entitled to stand upon his rights."

When the instruction in question was asked, the proof was that the bonds had been issued by the commissioners, and exchanged with the railroad company for a like amount of the company's income bonds. That exchange was a substantial compliance with the statute. It was made under a contemporaneous agreement between the commissioners, the railway company, and certain trustees, mutually selected, whereby the bonds passed, upon the exchange, under the control of those trustees, and were deposited in the Union Trust Company, to be surrendered — $10,000 at a time — only as the work of constructing the railroad progressed, to the company or the contractor on their order. The receipt of the trust company shows that it agreed to deliver them to the contractor or his agents or assigns, on the joint order of the trustees or any two of them. And it was proven that the bonds were delivered to the contractor or upon his order between May 10, 1870, and Aug. 4, 1871. The road was constructed as contemplated,

and the income bonds of the company remained in the hands of the commissioners or of some of them. Whether those bonds ultimately proved to be of any value is of no consequence as between the township and the plaintiff.

It thus appears that when the court was asked to give an instruction upon the basis that plaintiff could not recover, unless it was proven that he paid value for the bonds, it was established beyond question that the bonds had previously passed into the hands, or become pledged for the benefit, of the contractor who built the road. He acquired an interest, or a lien, on the bonds, to secure payment of the amount due him for his work and labor. He, therefore, became a holder for value in the sense that he paid real, in contradistinction from apparent, value, without notice of any fraud or illegality affecting the bonds. Story on Notes, sect. 195; *Railroad Company* v. *National Bank*, 102 U. S. 14; Byles on Bills, 117. No evidence was introduced or offered which in any degree impeached his good faith, or proved knowledge on his part that the preliminary conditions prescribed by statute had not been fully performed. The character of the bonds as negotiable securities, free from defences which might have been available as between the original parties, was established by their being pledged for the benefit of the contractor. So that, even if there was fraud or illegality in the inception of the bonds (apart from such illegality as would have made them absolutely void by whomsoever held), a defence upon that ground would not have been good against the contractor, and consequently is not available against the plaintiff. The latter, in virtue of the new and independent title derived from or traced to a prior *bona fide* holder for value, could stand upon the rights of such holder.

In any view of the case, no error was committed to the prejudice of the township, in excluding any of the evidence offered, or in refusing any of the instructions asked in its behalf.

Other questions in the case we pass by, as not necessary to be examined. We have considered all that seemed to affect the substantial rights of the parties.

*Judgment affirmed.*